## CASE NO.: 23-15480

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ROCHELLE SCOTT, individually, and
as co-special administrator of the estate
of ROY ANTHONY SCOTT; and
FREDERICK WAID, as co-special
administrator of the estate of ROY
ANTHONY SCOTT,

          Plaintiffs-Appellees,

   vs.

KYLE SMITH; THEODORE
HUNTSMAN; LAS VEGAS POLICE
DEPARTMENT,

          Defendants-Appellants.

Appeal from the United States District Court
District of Nevada, Las Vegas
Case No.: 2:20-cv-01872-RFB-EJY

## DEFENDANTS-APPELLANTS' OPENING BRIEF

Marquis Aurbach
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
canderson@maclaw.com
   Attorneys for Defendants-
   Appellants Kyle Smith; Theodore
   Huntsman, and Las Vegas
   Metropolitan Police Department

MAC:14687-307 5074153_2.docx

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendants-Appellants Kyle Smith and Theodore Huntsman are individuals.

Defendant-Appellant Las Vegas Metropolitan Police Department ("LVMPD") is a

governmental entity with no corporate affiliations. All Defendants-Appellants are

represented in the district court and this Court by Marquis Aurbach.

Dated this 7th day of August, 2023.

MARQUIS AURBACH


By /s/ Craig R. Anderson
    Craig R. Anderson, Esq.
    Nevada Bar No. 6882
    10001 Park Run Drive
    Las Vegas, Nevada 89145
    Attorneys for Defendants-Appellants
    Kyle Smith; Theodore Huntsman, and
    Las Vegas Metropolitan Police
    Department

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................1

II. JURISDICTIONAL STATEMENT AND STANDARD OF REVIEW ........3

    A.  JURISDICTION AND TIMELINESS.................................................3

    B.  JURISDICTION AND DENIAL OF QUALIFIED IMMUNITY........3

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW ...........................7

IV. STATEMENT OF THE CASE ...............................................8

    A.  THE SUBJECT INCIDENT. ...............................................8

        1.  Scott calls 911. ................................................8

        2.  The Officers contact Scott. ...............................8

        3.  The Officers go hands on with Scott. ....................9

        4.  The Officers' post-handcuffing actions. ..................13

        5.  Percipient witnesses. ......................................14

        6.  The Autopsy. ...............................................15

    B.  PROCEDURAL HISTORY. ..............................................15

V.  SUMMARY OF ARGUMENT ................................................16

VI. 42 U.S.C. § 1983 LEGAL STANDARDS ...................................17

VII. LEGAL ARGUMENT...................................................19

    A.  THE DISTRICT COURT ERRED IN UNILATERALLY
        CONCLUDING THAT THE OFFICERS LACKED PROBABLE

-i-

CAUSE TO DETAIN SCOTT. .......................................................19

1.   Plaintiff agrees that probable cause existed to detain Scott. .....20

2.   In the alternative, the Officers had probable cause to arrest
     Scott for a criminal activity. ......................................................23

B.   THE DISTRICT COURT ERRED IN DENYING THE
     OFFICERS QUALIFIED IMMUNITY ON PLAINTIFF'S
     FOURTH AMENDMENT EXCESSIVE FORCE CLAIM. .............24

1.   The law regarding excessive force and prone restraint. ..........24

2.   The Officers used objectively reasonable force and did not
     violate the Constitution. ..........................................................29

3.   There is no clearly established law prohibiting the Officers'
     actions in this case. ..................................................................39

C.   THE DISTRICT COURT ERRED IN FAILING TO GRANT THE
     OFFICERS QUALIFIED IMMUNITY ON PLAINTIFF 'S
     FOURTEENTH AMENDMENT CLAIM. ........................................54

1.   Relevant Fourteenth Amendment law. ....................................54

2.   The Officers did not violate Plaintiff's Fourteenth
     Amendment rights because Plaintiff lacks standing to pursue
     the claim, and, in the alternative, the Officers' actions were
     not conscience shocking. .........................................................56

D.   IF THIS COURT FINDS THAT THE OFFICERS' ACTED
     REASONABLY FOR FOURTH AND FOURTEENTH
     AMENDMENT PURPOSES, THEN PLAINTIFF'S *MONELL*
     CLAIMS FAIL AS WELL. .................................................................58

VIII.   CONCLUSION. .............................................................................59

MAC:14687-307 5074153_2.docx

# TABLE OF AUTHORITIES

## CASES

*A.B. v. Cty. of San Diego*,
    2020 WL 5847551 (S.D. Cal. Oct. 1, 2020),
    *aff'd* 2022 WL 1055558 (9th Cir. 2022) ......................... 25, 28, 37, 47, 48, 53, 57

*A.D. v. Cal. Highway Patrol*,
    712 F.3d 446 (9th Cir. 2013) ......................................................................... 54, 56

*Abdullahi v. City of Madison*,
    423 F.3d 763 (7th Cir. 2005) ......................................................................... 44, 47

*Abston v. City of Merced*,
    506 Fed.Appx. 650 (9th Cir. 2013) ...................................................................46

*Albright v. Oliver*,
    510 U.S. 266 (1994) ...........................................................................................18

*Arpin v. Santa Clara Valley Transp. Agency*,
    261 F.3d 912 (9th Cir. 2001) ......................................................................... 39, 50

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) ....................................................................................... 18, 19

*Ballou v. McElvain*,
    29 F.4th 413 (9th Cir. 2022) ..........................................................................4, 20

*Beech v. City of Stockton*,
    2021 WL 4429455 (E.D. Cal. 2021) ..................................................................31

*Bias v. Moynihan*,
    508 F.3d 1212 (9th Cir. 2007) ...........................................................................41

*Blankenhorn v. City of Orange*,
    485 F.3d 463 (9th Cir. 2007) .................................................................. 20, 42, 50

*Board of Comm'rs of Bryan Cty. v. Brown*,
520 U.S. 397 (1997) ....................................................................................55

*Borunda v. Richmond*,
885 F.2d 1384 (9th Cir. 1989) ...................................................................18

*Boyd v. Benton Cty.*,
374 F.3d 773 (9th Cir. 2004)......................................................................47

*Bryan v. MacPherson*,
630 F.3d 805 (9th Cir. 2009)............................................................... 51, 52

*Cady v. Dombrowski*,
413 U.S. 433 (1973) ....................................................................................21

*Carrillo v. Cty. of Los Angeles*,
798 F.3d 1210 (9th Cir. 2015) ...................................................................47

*City of Los Angeles v. Heller*,
475 U.S. 796 (1986) ....................................................................................59

*City of Tahlequah v. Bond*,
___U.S.___, 142 S.Ct. 9 (2021) ................................................................39

*Community House, Inc. v. Bieter*,
623 F.3d 945 (9th Cir. 2010)......................................................................47

Cortesluna v. Leon,
979 F.3d 645 (9th Cir. 2020)......................................................................37

*Cty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ....................................................................................55

*Devenpeck v. Alford*,
543 U.S. 146 (2004) ....................................................................................23

*District of Columbia v. Wesby*,
___U.S.___, 138 S.Ct. 577 (2018) ............................................................20

MAC:14687-307 5074153_2.docx

*Drummond v. City of Anaheim*,
434 F.3d 1052 (9th Cir. 2004) ..................................................................... *passim*

*Estate of Anderson v. Marsh*,
985 F.3d 726 (9th Cir. 2021)..................................................................................4

*Estate of Phillips v. City of Milwaukee*,
123 F.3d 586 (7th Cir. 1997)................................................................................26

*Ewing v. City of Stockton*,
588 F.3d 1218 (9th Cir. 2009) .............................................................................23

*Felarca v. Birgeneau*,
891 F.3d 809 (9th Cir. 2018)................................................................................53

*Forrester v. City of San Diego*,
25 F.3d 804 (9th Cir. 1994)......................................................................... 25, 34

*Fuller v. M.G. Jewelry*,
950 F.2d 1437 (9th Cir. 1991) .............................................................................20

*Gantt v. City of Los Angeles*,
717 F.3d 702 (9th Cir. 2013)................................................................................55

*Garcia v. Yuba Cty. Sheriff's Dep't.*,
2023 WL 3124398 (E.D. Cal. Apr. 27, 2023) ....................................................45

*Garlick v. Cty. of Kern*,
167 F.Supp.3d 1117 (E.D. Cal. 2016)................................................... 28, 44, 46

*George v. Morris*,
736 F.3d 829 (9th Cir. 2013)..................................................................................5

*Gibson v. Cty. of Washoe*,
290 F.3d 1175 (9th Cir. 2002) .............................................................................34

Gordon v. City & Cty. of San Francisco,
2021 WL 5449074 (N.D. Cal. Nov. 22, 2021) ...................................... 47, 48, 53

MAC:14687-307 5074153_2.docx

*Graham v. Connor*,
　490 U.S. 386 (1986) ......................................................................... 24, 29, 31, 32

*Greer v. City of Hayward*,
　229 F.Supp.3d 1091 (N.D. Cal. 2017) ............................................. 28, 44, 45, 53

*Gregory v. Cty. of Maui*,
　523 F.3d 1103 (9th Cir. 2008) ......................................................... 33, 34, 36, 43

*Hall v. City of Fremont*,
　520 Fed.Appx. 609 (9th Cir. 2013) ......................................................................41

*Harlow v. Fitzgerald*,
　457 U.S. 800 (1982) .............................................................................................19

*Hughes v. Rodriguez*,
　31 F.4th 1211 (9th Cir. 2022) ................................................................................4

*Hunter v. Bryant*,
　502 U.S. 224 (1991) .............................................................................................41

*Jackson v. City of Bremerton*,
　268 F.3d 646 (9th Cir. 2001) ......................................................................... 30, 53

*Johnson v. BART*,
　724 F.3d 1159 (9th Cir. 2013) ....................................................................... 56, 57

*Johnson v. Jones*,
　515 U.S. 304 (1995) ...................................................................................3, 54, 56

*Kisela v. Hughes*,
　584 U.S. ___, 138 S.Ct. 1148 (2018) ...................................................................49

*Lal v. California*,
　746 F.3d 1112 (9th Cir. 2014) ..............................................................................18

*LeFay v. LeFay*,
　673 Fed.Appx. 722 (9th Cir. 2016) ......................................................................41

-vi-

*Luchtel v. Hagemann*,
  623 F.3d 975 (9th Cir. 2010)....................................................... 30, 36, 39, 43, 50

*M.A.R. v. City of Los Angeles*,
  2022 WL 2167453 (C.D. Cal. March 28, 2022) ................................................49

*Maag v. Wessler*,
  960 F.2d 773 (9th Cir. 1991)................................................................................21

*Madrid v. City of Fresno*,
  2011 WL 13243581 (E.D. Cal. Feb. 23, 2011)...................................... 28, 44, 46

*Malley v. Briggs*,
  475 U.S. 335 (1986) ..............................................................................................19

*Martin v. City of Oceanside*,
  360 F.3d 1078 (9th Cir. 2004) .............................................................................22

*Monell v. Dep't of Soc. Svcs.*,
  436 U.S. 658 (1978) .......................................................................... 2, 8, 17, 59

*Moore v. City of Berkeley*,
  801 Fed.Appx. 480 (9th Cir. 2020) ............................................................. 35, 58

*Moreland v. Las Vegas Metro Police Dep't.*,
  159 F.3d 365 (9th Cir. 1998)....................................................................... 24, 54

*Mullinex v. Luna*,
  577 U.S. 7 (2015) ..................................................................................................40

*Patel v. Kent Sch. Dist.*,
  648 F.3d 965 (9th Cir. 2011)................................................................................55

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ..............................................................................................19

*Plumhoff v. Rickard*,
  572 U.S. 765 (2014) ..........................................................................................4, 18

MAC:14687-307 5074153_2.docx

*Porter v. Osborn,*
   546 F.3d 1131 (9th Cir. 2008) .............................................................56

*Rice v. Morehouse*,
   989 F.3d 1112 (9th Cir. 2021) ...........................................................42

*Rivas-Villegas v. Cortesluna*,
   ___U.S.___, 142 S.Ct. 4 (2022)............................................ 37, 39, 47

*Rodriguez v. City of San Jose*,
   930 F.3d 1123 (9th Cir. 2019) ......................................................4, 21

*Safford Unified Sch. Dist. No. 1 v. Redding*,
   557 U.S. 364 (2009) ...........................................................................20

*Sandoval v. Officer Melvin of Winston Police Dep't,*
   2021 WL 920858 (D. Or. 2021),
   aff'd sub nom. *Sandoval v. Melvin*, 2022 WL 883744 (9th Cir. 2022)..............31

*Scott v. Harris*,
   550 U.S. 372 (2007) ................................................................. 3, 4, 21

*Scott v. Henrich*,
   39 F.3d 912 (9th Cir. 1994)........................................................ 34, 53

*Shafer v. Cty. of Santa Barbara*,
   868 F.3d 1110 (9th Cir. 2017) ...........................................................40

*Sinclair v. City of Seattle*,
   61 F.4th 674 (9th Cir. 2023) ..............................................................56

*Slater v. Deasey*, 7
   76 Fed.Appx 942 (9th Cir. 2019)........................................... 28, 45, 52

*Stickney v. City of Phoenix,*
   2023 WL 2976943 (D.Az. Mar. 17, 2023) ........................................49

-viii-

*Tan Lam v. City of Los Banos*,
  976 F.3d 986 (9th Cir. 2020) ................................................................55

*Tatum v. City & Cty. of San Francisco*,
  441 F.3d 1090 (9th Cir. 2006) ................................. 23, 26, 27, 47, 48

*Tucker v. Las Vegas Metro. Police Dep't*,
  470 Fed.Appx. 627 (9th Cir. 2012) ............................................. 46, 53

*United States v. Brown*,
  996 F.3d 998 (9th Cir. 2021) ................................................................32

*United States v. King*,
  990 F.2d 1552 (10th Cir. 1993) ...........................................................22

*United States v. Willfong*,
  274 F.3d 1297 (9th Cir. 2001) .............................................................39

*Vanegas v. City of Pasadena*,
  46 F.4th 1159 (9th Cir. 2022) ..............................................................20

*Vos v. City of Newport Beach*,
  892 F.3d 1024 (9th Cir. 2018) .............................................................32

*Wheeler v. City of Santa Clara*,
  894 F.3d 1046 (9th Cir. 2018) .............................................................56

*White v. Pauly*,
  580 U.S. 73 (2017) ...............................................................................39

*Wilkinson v. Torres*,
  610 F.3d 546 (9th Cir. 2010) ............................................... 4, 5, 54, 57

*Williamson v. City of National City,*
  23 F.4th 1146 (9th Cir. 2022) ..............................................................25

*Young v. Cty. of Los Angeles*,
  655 F.3d 1156 (9th Cir. 2011) ...................................................... 51, 52

*Zelaya v. Las Vegas Metro. Police Dep't,*
   682 Fed.Appx. 565 (9th Cir. 2017) ........................................................ 45, 56, 58

## CONSTITUTIONAL PROVISIONS

Fourteenth Amendment ................................................. 3, 7, 17, 54, 56, 58

Fourth Amendment ....................... 3, 7, 21, 23, 24, 39, 41, 42, 45, 46, 47, 49, 50, 54

## RULES

FRAP 4(a)(1)(A) ...........................................................................3

## STATUTES

28 U.S.C. § 1331 ...........................................................................3

28 U.S.C. § 1343 ...........................................................................3

28 U.S.C. § 1367 ...........................................................................3

28 U.S.C. § 2107(a) ........................................................................3

42 U.S.C. § 1983 ........................................................ 2, 3, 8, 16, 17, 21, 54

Nev. Rev. Stat. § 41.100(3) ...............................................................24

Nev. Rev. Stat. § 207.280 .................................................................23

Nev. Rev. Stat. § 433A.160 ........................................................... 10, 19

Nev. Rev. Stat. § 433A.160(1)(a) .........................................................21

Nev. Rev. Stat. § 453.411 .................................................................23

MAC:14687-307 5074153_2.docx

I. **INTRODUCTION**

This is a tragic 42 U.S.C. § 1983 excessive force lawsuit. On March 3, 2019, Roy Anthony Scott ("Scott") called 911 and reported that three men, armed with a saw, were attempting to break into his apartment. LVMPD officers Kyle Smith and Theodore Huntsman ("the Officers") responded. At the apartment, the Officers encountered an agitated Scott armed with a pipe and knife but did not find three men armed with a saw. The Officers recognized that Scott might be in medical crisis or on drugs and decided to take Scott into custody to get him medical help. Scott voluntarily surrendered his pipe and knife but refused to be patted down for other weapons. The Officers explained to Scott that they were there to help him, but that they needed to ensure he had no additional weapons. They spoke calmly, maintained their distance, displayed no weapons, and requested additional units respond. However, when the agitated Scott reached towards his jacket, Ofc. Huntsman stopped him by grabbing his left arm. The Officers then attempted to handcuff Scott from a standing position. Scott resisted the Officers' efforts and eventually ended up on the ground.

Once on the ground, Scott continued to resist, including kicking at the Officers. Still, the Officers spoke calmly to Scott, attempting to assure him they were only there to help. They never punched, kicked, or struck Scott. To counter Scott's resistance, Ofc. Huntsman placed his right knee on Scott's shoulder/upper

Page 1 of 63

MAC:14687-307 5074153_2.docx

back area, and Ofc. Smith placed a knee on Scott's buttocks. It took the Officers about 90 seconds to handcuff Scott. Once handcuffed, the Officers immediately removed all body weight from Scott and placed him in the "recovery position."[1] Despite the fact Scott showed no signs of injury and never complained of difficulty breathing, the Officers called for medical assistance. Several minutes after handcuffing, while the Officers waited for medical to arrive, Scott's breathing became shallow. The Officers confirmed Scott's pulse and requested medical to "expedite." Medical personnel arrived but were unable to revive Scott, who eventually passed away. The medical examiner concluded Scott died from methamphetamine intoxication and found the Officers' uses of force played no role in his death.

As a result of these facts, Scott's daughter, individually and as the administrator of Scott's estate, sued the Officers and LVMPD. The lawsuit alleges (1) excessive force under 42 U.S.C. § 1983, (2) denial of medical care under 42 U.S.C. § 1983, (3) interference with familial relations under § 1983, (4) a *Monell* claim against LVMPD, (5) violation of the Americans with Disability Act ("ADA"), and (6) a state law wrongful death claim. After discovery was completed, the Officers and LVMPD filed a motion for summary judgment on all

---

[1] The "recovery position" entails placing a restrained person on their side to facilitate breathing.

MAC:14687-307 5074153_2.docx

claims. The district court granted summary judgment on Plaintiff's denial of medical care claim but denied summary judgment on all other claims. The Officers now appeal the district court's denial of qualified immunity on the § 1983 claims for excessive force and interference with familial relations.

## II. JURISDICTIONAL STATEMENT AND STANDARD OF REVIEW

### A. JURISDICTION AND TIMELINESS.

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 because Plaintiff's Fourth Amendment and Fourteenth Amendment claims arise under 42 U.S.C. § 1983. The appealed order is the district court's March 14, 2023 Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment. (1-ER-002-31) The notice of appeal was timely filed on March 29, 2023, pursuant to 28 U.S.C. § 2107(a) and FRAP 4(a)(1)(A), which provide that a notice of appeal must be filed within thirty days of entry of the judgment or order from which the appeal is taken.

### B. JURISDICTION AND DENIAL OF QUALIFIED IMMUNITY.

This Court instructed the parties "to address the basis for this court's jurisdiction over this appeal." (Dkt. #6) A district court's denial of qualified immunity based on factual disputes cannot be appealed on an interlocutory basis. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). The Supreme Court, however, has carved out exceptions to this rule in *Scott v. Harris*, 550 U.S. 372 (2007) and

MAC:14687-307 5074153_2.docx

*Plumhoff v. Rickard*, 572 U.S. 765 (2014). In *Scott*, the Court emphasized that: "Where the record taken as a whole could not lead a rational trier-of-fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380 (citations omitted). A government official can contest a denial of qualified immunity if the official accepts the plaintiff's facts as true and demonstrates that qualified immunity should have been granted. Finally, this Court can disregard a district court's factual findings if the findings are "blatantly contradicted" by the objective evidence. *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) (citing *Scott*, 550 U.S. at 378). The "blatantly contradicted" logic has been applied to both video evidence and other types of evidence capable of objectively disproving witness testimony. *Id.; see also Wilkinson v. Torres*, 610 F.3d 546, 551-52 (9th Cir. 2010).

This Circuit (as have many other circuits) has struggled to reconcile *Johnson, Scott,* and *Plumhoff.* In *Estate of Anderson v. Marsh*, 985 F.3d 726, 731-32 (9th Cir. 2021), a panel concluded this Court has appellate jurisdiction to review purely legal questions, but it cannot resolve factual disputes. The issue is "whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022) (citing *Estate of Anderson*, 985 F.3d at 731).

Page 4 of 63

MAC:14687-307 5074153_2.docx

Here, the district court found the following facts to be disputed: (1) whether Scott was reaching into his jacket just prior to the Officers going hands on, (2) how Scott ended up on the ground (i.e., on his own or via a takedown), (3) whether Scott exhibited extraordinary strength during the struggle, (4) how long Scott was "face down in a prone position on the ground" pre-handcuffing, (5) how long the Officers applied body weight to Scott pre-handcuffing, and (6) the cause of death. (1-ER-006) Later in the Order, the district court also questioned whether probable cause existed to detain Scott. (1-ER-011-012, 015)

Except for the probable cause issue, the Officers do not challenge any of the district court's factual disputes because they are not material or necessary to resolve the qualified immunity issue. *See George v. Morris*, 736 F.3d 829, 836 (9th Cir. 2013) ("Thus, in this appeal, we are confined to the question of 'whether defendant[s] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor.' [Citation]"). The question of whether the facts show a violation of clearly established law is a question of law reviewed de novo. *Wilkinson*, 610 F.3d at 550.

All the "disputed facts" involve the Officers' pre-handcuffing force. This Court has never held it is excessive to take a mentally ill individual to the ground for handcuffing purposes. In fact, this Court has held that such pre-handcuffing

Page 5 of 63

force is reasonable and that the use of body weight only becomes an issue once a suspect is prone, handcuffed, and no longer a threat. *See, Drummond v. City of Anaheim*, 434 F.3d 1052 (9th Cir. 2004). The district court never expressly found that the Officers' post-handcuffing force was unreasonable—presumably because no force was used after Scott was handcuffed. In error, the district court refused to draw a distinction between the Officers' pre-handcuffing force and post-handcuffing force, claiming the Officers were construing *Drummond* too narrowly. (1-ER-018) Had the district court acknowledged the distinction, it would have had no choice but to grant the Officers qualified immunity because it is undisputed the Officers removed all body weight and ceased all force within seconds of handcuffing Scott. Thus, the district court's disputed facts regarding the Officers' pre-handcuffing force are immaterial.

The district court's finding that the Officers lacked probable cause to perform a mental health hold would be a material disputed fact. This finding is "blatantly contradicted" by the record as no reasonable jury could find that the Officers lacked probable cause to perform the mental health hold. This fact is so obvious that even the Plaintiff admitted this fact (6-ER-1239-40) and never raised it to the district court.

In sum, this Court has jurisdiction to determine whether as a matter of law the Officers should have been granted qualified immunity.

MAC:14687-307 5074153_2.docx

## III.   STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred by concluding that the Officers lacked probable cause to detain Scott for a mental health hold when a hallucinating Scott called 911 claiming that three men were trying to enter his apartment, exited his apartment in an agitated state with two potentially deadly weapons, and, according to Plaintiff, was "experiencing a severe mental health crisis."

2.      Whether the district court erred by denying the Officers qualified immunity on the Fourth Amendment excessive force claim under both prongs of the qualified immunity analysis when:

        a.      There is no evidence of a constitutional violation because it is undisputed that the Officers only used minimal force to take Scott into custody and, more importantly, removed all body weight and ceased all force seconds after handcuffing Scott.

        b.      There is no clearly established law prohibiting the use of body weight to facilitate handcuffing of a resisting individual if the body weight is timely removed after handcuffing is complete.

3.      Whether the district court erred by denying the Officers qualified immunity on the Fourteenth Amendment familial relationship claim when Plaintiff generated no evidence that the Officers acted with deliberate indifference or with a

MAC:14687-307 5074153_2.docx

purpose to harm Scott, and, at a minimum, no clearly established law exists supporting Plaintiff's claim.

4.      Whether this Court should exercise supplemental jurisdiction over Plaintiff's *Monell*[2] claim if it concludes no constitutional violation occurred and dismisses the § 1983 claims.

## IV.     <u>STATEMENT OF THE CASE</u>

### A.     THE SUBJECT INCIDENT.

#### 1.     <u>Scott calls 911.</u>

On March 3, 2019, at around 3:09 a.m., Scott called 911 reporting three assailants were outside his apartment with a saw. Scott refused to answer any dispatcher questions and hung up. Attempts to reconnect with Scott were unsuccessful. (Dispatch Audio) LVMPD officers Huntsman and Smith were assigned the call. (4-ER-557)

#### 2.     <u>The Officers contact Scott.</u>

At 3:20 a.m., the Officers arrived at Scott's apartment and found "there[] [was] nothing suspicious" outside Scott's apartment. (4-ER-668-669, Smith BWC I at T11:25:20Z) The Officers knocked on Scott's door to make sure he was okay, and Scott responded by telling the Officers to "kick the door in." (Huntsman BWC at T11:26:41Z) When Scott refused to voluntarily open the door, the two officers

---

[2] *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658, 698 (1978).

MAC:14687-307 5074153_2.docx

left the apartment door and contacted their sergeant, who told them to knock again to make sure everyone was okay. (4-ER-561-562; Smith BWC I at T11:29:41Z) Prior to returning, the Officers were able to visualize Scott through an apartment window. (4-ER-672; Officers' BWC at T11:31:58Z)

Ofc. Smith returned to the apartment and knocked. (4-ER-673; Officers' BWC at T11:32:20Z) Inside, he heard commotion and someone rushing the door. (4-ER-673-674; Officers' BWC at T11:33:00Z) Ofc. Smith retreated down the stairs. (*Id.*) Scott exited the apartment holding a metal pipe in his hand. (4-ER-674; 4-ER-784-89; Officers' BWC at T11:33:05Z) Ofc. Smith drew his firearm and twice ordered Scott to drop the pipe. (4-ER-674; 4-ER-565-566) Scott dropped the pipe, and Ofc. Smith holstered his firearm while Ofc. Huntsman secured the pipe. (4-ER-570; Officers' BWC at T11:33:18Z)

### 3. The Officers go hands on with Scott.

The Officers recognized that Scott needed help as he was "in some sort of mental distress" or "possible drug usage." (4-ER-675; 4-ER-562) Although the Officers did not intend to arrest Scott for a crime (4-ER-701), they did conclude that Scott met the legal qualifications for a medical hold to determine whether he

MAC:14687-307 5074153_2.docx

was a danger to himself or others.[3] In Nevada, this type of detention is known as a "Legal 2000." 1-ER-007 n.2.; s*ee also* Nev. Rev. Stat. § 433A.160.[4]

Scott walked past the Officers and placed his back against an apartment building wall. The Officers calmly asked Scott to show his hands so they could frisk him "for weapons." (Officers' BWC at T11:33:31Z) Scott responded, "I don't have any weapons," while simultaneously pulling a knife from his right-front pants pocket and handing it to Ofc. Huntsman. (Officers' BWC at T11:33:40Z; 4-ER-784-89) Ofc. Huntsman discarded the knife and asked Scott to turn around. Scott refused, stating "I have paranoid schizophrenia." (Officers' BWC at T11:33:43Z) The Officers calmly told Scott "I get it" and "that's fine." (Officers' BWC at T11:33:48Z) Scott asked the Officers to "just put me in the car." (Officers' BWC at T11:33:58Z) The Officers kept their distance, never displayed any weapons or

---

[3] Plaintiff has never alleged *or argued* that the Officers lacked probable cause to take Scott into custody for a mental health hold. (*See* (6-ER-1220-1252)

[4] A Legal 2000 is an involuntary commitment of a mentally ill subject. Nevada Revised Statute § 433A.160 governs such commitments. According to that statute, a police officer, without warrant, may "[t]ake a person alleged to be a person with mental illness into custody to apply for the emergency admission of the person for evaluation, observation and treatment . . . if the . . . officer . . . has, based upon his or her personal observation of the person alleged to be a person with mental illness, probable cause to believe that the person has a mental illness and, because of that illness, is likely to harm himself or other if allowed his or her liberty."

Page 10 of 63

tools, and continuously attempted to reassure Scott in calm voices that they were only there to help him. (Officers' BWC at T11:33:48Z-T11:35:00Z)

Because Scott had already produced two potentially deadly weapons, the Officers were concerned that he might possess other weapons. (4-ER-677-678) In addition, they could not transfer Scott to medical personnel until he had been searched for weapons and restrained. The Officers attempted to accommodate Scott by allowing him to dictate the location of the pat down. (4-ER-586) The Officers never rushed Scott or escalated the situation. Eventually, Scott reached toward his jacket with his left hand. (Officers' BWC at T:11:35:03Z) Ofc. Huntsman, fearing Scott might be attempting to reach into his jacket, responded by grabbing Scott's left arm. (Officers' BWC at T11:35:12Z; 4-ER-588-89) Ofc. Huntsman placed Scott's arm behind his back as Ofc. Smith approached Scott's right side to assist. (Officers' BWC at T11:35:23Z) Scott began to physically resist and continually asked "what are you doing?" (*Id.;* 4-ER-684) Scott eventually went to the ground. (Officers' BWC at T11:35:38Z; 4-ER-588; 4-ER-697, 769)

Once on the ground, Scott rolled onto his back. Ofc. Huntsman attempted to control Scott's upper body, and Ofc. Smith focused on his lower body. (4-ER-604) The Officers described Scott as "extraordinarily strong" and having "superhuman strength." (4-ER-595-96; 4-ER-703-04) Still, rather than use force (i.e., strikes or tools), the Officers attempted to wait out Scott in hopes he would tire himself out.

MAC:14687-307 5074153_2.docx

(*Id.*) Ofc. Smith kept his right knee on Scott's hip area, while keeping most of his weight off Scott. (Officers' BWC at T11:35:51Z) Scott continuously yelled "please, stop" and "leave me alone" while kicking and thrashing his legs. (*Id.*)

During the struggle, one of Scott's neighbors, Ed Davis, exited his apartment and tried to assist the Officers by telling Scott to "calm down." (Officers' BWC at T11:36:32Z) The Officers continued to talk calmly with Scott and reassure him that they were only there to help. (*Id.*) The Officers told Scott they wanted to "sit [him] up," but Scott continued to struggle and even attempted to kick the Officers. (Officers' BWC at T11:38:23Z) Eventually, Scott rolled over onto his stomach. (Officers' BWC at T11:38:34Z) Ofc. Huntsman attempted to control Scott by placing his left knee across Scott's back and shoulder area with most of his weight on the ground. (Officers' BWC at T11:38:35Z; 4-ER-604) Ofc. Smith placed his left knee on Scott's buttocks, with most of his weight also still on the ground. (Huntsman BWC at T11:38:56Z; 4-ER-706) Scott continued to struggle with the Officers and "tried to grab" Ofc. Huntsman and Ofc. Smith's handcuffs. (Officers' BWC at T11:39:06Z; 4-ER-756) Eventually, the Officers successfully got Scott into handcuffs. (Officers' BWC at T11:39:52Z; 4-ER-604)

After completing the handcuffing process, the Officers immediately removed all body weight and placed Scott into the "recovery position" – i.e., onto

MAC:14687-307 5074153_2.docx

his side. (Officers' BWC at T11:40:10Z and 4-ER-602, 616) Although Scott never complained of injury or inability to breathe, the Officers proactively called for medical. (3-ER-512; 4-ER-601-02)

### 4. The Officers' post-handcuffing actions.

After Scott was placed in the recovery position, he continued to thrash about on the ground and yell at the Officers - showing no signs of respiratory distress. (Officers' BWC at T11:40Z) Scott never complained about an inability to breathe. While the Officers waited for medical, they monitored Scott, actively prevented him from "hurt[ing] himself" by keeping his head out of the landscaping rocks, and ensured he remained in the recovery position. (Officers' BWC at T11:40:52Z - T11:42:18Z) The Officers continuously reassured Scott they were there to help him, and that medical was on its way. (Officers' BWC at T11:42:50Z)

After several minutes, Scott ceased yelling and thrashing around. (Officers' BWC at T11:45:13Z) Noticing the change, Ofc. Smith patted Scott on the left shoulder and asked him "you alright man?" (Officers' BWC at T11:45:31Z) Ofc. Smith told Ofc. Huntsman that "its weirding me out how calm he is." (Officers' BWC at T11:46:14Z.) The Officers confirmed that Scott was "still breathing" and Ofc. Huntsman found a "regular pulse." (Officers' BWC at T11:46:20-58Z; 4-ER-602) Ofc. Huntsman updated dispatch and asked for medical to expedite. (3-ER-512; 4-ER-608-09) He then performed a sternum rub. (Officers' BWC at

MAC:14687-307 5074153_2.docx

T11:47:52Z; 4-ER-609-10) Ofc. Smith called his sergeant and told him that Scott's breathing was "faint." (Officers' BWC at T11:49:20-40Z.) Eventually, Ofc. Smith ran to the street to attempt to "flag medical down." (Officers' BWC at T11:52:00Z.) At no time during the entire encounter did Scott ever tell the Officers he could not breath or that he was having any medical distress. (4-ER-777)

After Ofc. Smith directed medical to Scott's location, paramedics began treating Scott and eventually transported him on a gurney. (Officers' BWC at T11:54:10Z) Scott was later pronounced deceased.

### 5.    **Percipient witnesses.**

Two of Scott's neighbors witnessed portions of the event: Ed Davis ("Davis") and Koatha Gorden, Jr. ("Gorden") According to Gorden, it was his perception that Scott was "agitated and erratic" (5-ER-849) and that the Officers only wanted to "help" Scott, as he never saw any actions by the Officers that he felt were excessive or unnecessary. (5-ER-851-56) He described the Officers as "professional." (5-ER-851)

Davis also witnessed most of the encounter and noted that the Officers did not "just attack" Scott, but rather "sat there . . . talking to him." (5-ER-861) The Officers asked Davis to help de-escalate the situation by talking to Scott. (5-ER-868) Davis told investigating detectives that Scott threw himself on the ground. (5-

MAC:14687-307 5074153_2.docx

ER-868, 870) Similar to Gorden, Davis did not see the Officers use any unnecessary force but did see Scott attempt to kick the Officers. (5-ER-871)

### 6. **The Autopsy.**

On March 4, 2019, Scott's autopsy was performed by Dr. Leonardo Roquero ("Dr. Roquero"). Dr. Roquero concluded that Scott died due to methamphetamine intoxication. (5-ER-884) It is Dr. Roquero's opinion that the Officers did not asphyxiate Scott, and their restraint techniques did not contribute to Scott's death. (5-ER-938-39, 945, 947) Dr. Roquero explained that prone-restraint asphyxia occurs when an individual becomes unresponsive "with someone on top of him." (5-ER-938) It is a medical fact that asphyxia does not occur in a delayed manner, as the impact on the suspect's breathing will occur immediately – and not six minutes into the future. (5-ER-1003-04)

### B. **PROCEDURAL HISTORY.**

On October 7, 2020, Plaintiff filed her complaint. (6-ER-1220-1252) The Officers answered and pled the affirmative defense of qualified immunity. (6-ER-1212-1219) After completion of discovery, the Officers (and LVMPD) filed a motion for summary judgment on all claims. (3-ER-468-497) Plaintiff opposed the motion (2-ER-068-098), and Defendants replied (2-ER-034-052). On March 14, 2023, the district court entered its order granting in part and denying in part

MAC:14687-307 5074153_2.docx

Defendants' motion. (1-ER-002-031) The district court granted summary judgment on Plaintiff's denial of medical claim and denied on all other claims.

## V.   <u>SUMMARY OF ARGUMENT</u>

The district court erred in denying the Officers qualified immunity on the Plaintiff's § 1983 claims when it concluded that material issues of fact prevented a proper qualified immunity analysis and that the law regarding the force used by the Officers was clearly established.

First, the Officers acted reasonably as a matter of law when they concluded probable cause existed to perform a mental health hold on Scott to evaluate whether he was a danger to himself or others. Scott had called 911, falsely reporting that three men were attempting to break into his apartment with a saw. When the Officers arrived, Scott exited his apartment in an agitated state and armed with two deadly weapons. Due to Scott's unusual behavior, the Officers reasonably concluded he needed a medical evaluation to ensure he was not a danger to himself or others. Plaintiff agrees that Scott was "experiencing a severe mental health crisis", and she has never argued the Officers lacked probable cause to detain Scott.

Second, the Officers are entitled to qualified immunity on Plaintiff's excessive force claim because the Officers used only the minimal force necessary to get Scott into custody. Ninth Circuit law allows officers to take resisting

MAC:14687-307 5074153_2.docx

individuals to the ground and use body weight to facilitate handcuffing – even if the individual is mentally ill and not suspected of a crime. Further, at a minimum, there is no clearly established law prohibiting the Officers' force in this case. In compression asphyxia cases, the law of this Circuit is clear: it is excessive for an officer to "squeez[e] the breath from a compliant, prone, and *handcuffed* individual despite his pleas for air." *Drummond*, 434 F.3d at 1059 (emphasis added). Because the Officers removed all body weight and placed Scott in the recovery position immediately after his handcuffing, the Officers acted in complete harmony with *Drummond* and its progeny.

Third, the Officers are entitled to summary judgment on Plaintiff's Fourteenth Amendment familial relationship claim. The video evidence clearly shows that the Officers did not act with deliberate indifference or with a purpose to harm Scott.

Fourth, and finally, if this Court concludes that the Officers acted reasonably as a matter of law, it should dismiss the *Monell* claim against LVMPD. For the *Monell* claim to move forward, the Plaintiff must first establish a constitutional violation.

## VI.   42 U.S.C. § 1983 LEGAL STANDARDS

Section 1983 is not itself a source of substantive rights, but merely the procedural vehicle by which to vindicate federal rights elsewhere conferred. *See*

MAC:14687-307 5074153_2.docx

*Albright v. Oliver*, 510 U.S. 266, 271 (1994). To make out a prima facie case under § 1983, a plaintiff must show that a defendant: (1) acted under color of law, and (2) deprived the plaintiff of a constitutional right. *See Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1989). The Officers do not dispute that they acted under color of law. Therefore, the first task of this court is to determine whether the defendant officers violated the Constitution. *See Albright*, 510 U.S. at 271. In addition, the Officers have raised the affirmative defense of qualified immunity.

"In determining whether an officer is entitled to qualified immunity, [a court] consider[s] (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted). The Supreme Court has advised lower courts construing claims of qualified immunity "not to define clearly established law at a high level of generality." *Plumhoff*, 572 U.S. at 729 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). The import of that instruction is, as the Supreme Court has explained, that "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* The Supreme Court has explained that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

Page 18 of 63

have known'." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law'." *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## VII. <u>LEGAL ARGUMENT</u>

### A. THE DISTRICT COURT ERRED IN UNILATERALLY CONCLUDING THAT THE OFFICERS LACKED PROBABLE CAUSE TO DETAIN SCOTT.

The parties have always agreed that probable cause existed to detain Scott as he was "experiencing a severe mental health crisis." (*See* 6-ER-1239-40) Ignoring the plaintiff's admission, and, without briefing, the district court unilaterally concluded that "[t]he record does not support a finding by this Court that the Officers had probable cause to believe that Scott was likely to harm anyone, including himself, if left at his liberty", and, therefore, under Nev. Rev. Stat. § 433A.160, the Officers lacked probable cause to detain Scott. (1-ER-011-012) Due to this conclusion, the district court found that any force was unreasonable and that Scott's resistance to the Officers' handcuffing efforts was allowed because "a person has a limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic." 1-ER-013 (quoting *Blankenhorn v. City of*

Page 19 of 63

*Orange*, 485 F.3d 463, 479 (9th Cir. 2007)). In other words, the district court used its lack of probable cause finding to conclude any force used by the Officers was unreasonable. The district court's unilateral finding is "blatantly contradicted" by the record and can be ignored by this Court. *See Ballou*, 29 F.4th at 421.

### 1. Plaintiff agrees that probable cause existed to detain Scott.

"Probable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009). Probable cause "is not a high bar." *District of Columbia v. Wesby*, ___U.S.___, 138 S.Ct. 577, 586 (2018) (citations omitted). "Even absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information the [] officers possessed." *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1166 (9th Cir. 2022) (quoting *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442-43 (9th Cir. 1991)).

"The Supreme Court has recognized a category of police activity relating to the protection of public health and safety—a category commonly referred to as the 'community caretaking function'—that is 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal

MAC:14687-307 5074153_2.docx

statute.'" *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1137 (9th Cir. 2019) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). In Nevada (and almost every other jurisdiction) police officers can lawfully take an individual into custody if the officer has "probable cause to believe that person has a mental illness, and because of that illness, is likely to harm himself or herself or others if allowed his or her liberty." Nev. Rev. Stat. § 433A.160(1)(a) (amended 2019). For § 1983 purposes, the lawfulness of an involuntary commitment detention is measured by Fourth Amendment standards.[5] *See Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991) (holding seizure of suspected mentally ill person for psychiatric evaluation is "analogous to a criminal arrest and must therefore be supported by probable cause").

Here, it is undisputed that Scott called 911, reporting non-existent assailants were attempting to harm him, and, when the Officers arrived, he exited his apartment with two deadly weapons and in obvious distress. Any reasonable officer would have concluded that a fair probability existed that Scott might be mentally ill and a danger to himself or others. In fact, it would be difficult to justify the Officers' behavior if they had just left Scott in his "severe" mental distress and just hoped for the best. *See Scott*, 550 U.S. at 385 (the Fourth Amendment requires

---

[5] Although it does not make difference, the district court implied that Nevada state law, not the Fourth Amendment, governed the probable cause issue.

MAC:14687-307 5074153_2.docx

police to make objectively reasonable decisions; it does not require them to do nothing and hope for the best); *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) ("police are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions,' including that a police officer may seize a person without violating the Fourth Amendment "to ensure the safety of the pubic and/or the individual, regardless of suspected criminal activity."); *see also Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir. 2004) (same).

The Plaintiff concedes probable cause existed. In her Complaint she admits Scott was "experiencing a severe mental health crisis" (6-ER-1239-40) and that the Officers "should have known that [Scott] suffered from a psychiatric disability based on his behavior" (6-ER-1239-40). During discovery, Plaintiff confirmed her position. In interrogatory answers, Plaintiff admitted "[t]here may have been a basis [i.e., probable cause] to transport Roy Scott to mental facility for a Legal 2000 evaluation." (2-ER-065) Likewise, Plaintiff's police practices expert never challenged the Officers' right to detain Scott and only argued the force used to perform the detention was unreasonable. (3-ER-396-429) Finally, in Plaintiff's summary judgment opposition, she stressed Scott's lack of criminal activity and stated "[t]he only basis for detaining Scott was a 'Legal 2000' hold for Scott to obtain help for mental health problems." (2-ER-070)

MAC:14687-307 5074153_2.docx

Thus, the record "blatantly contradicts" the district court's unilateral finding that the Officers' lacked probable cause to detain Scott.

**2.      In the alternative, the Officers had probable cause to arrest Scott for a criminal activity.**

The Supreme Court has explained that when there is probable cause to arrest for any crime, the arrest does not violate the Fourth Amendment, even if that crime was not actually charged. *See Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004); *Ewing v. City of Stockton*, 588 F.3d 1218, 1230 n.19 (9th Cir. 2009). Here, the Officers had probable cause to believe Scott had committed crimes. Scott's unusual behavior and his 911 call supported a conclusion that he might be under the influence of a controlled substance. *See Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1094-05 (9th Cir. 2006) (noting that detainee mumbling, disobeying commands and perspiring heavily created "a fair probability he had committed a crime"); Nev. Rev. Stat. § 453.411 (unlawful to use controlled substance). And, his call to 911 gave the Officers' probable cause to detain Scott to investigate a false police report. *See* Nev. Rev. Stat. § 207.280 (crime to knowingly make a false police report). Because the parties never briefed this issue, the district court never considered this argument in concluding the Officers lacked probable cause.

MAC:14687-307 5074153_2.docx

**B.     THE DISTRICT COURT ERRED IN DENYING THE OFFICERS QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT EXCESSIVE FORCE CLAIM.**

The gravamen of Plaintiff's lawsuit is that the Officers violated Scott's Fourth Amendment rights through use of excessive force. This claim is held by Scott's estate and is against the officers in their individual capacities. *See Moreland v. Las Vegas Metro Police Dep't.*, 159 F.3d 365, 369-70 (9th Cir. 1998); Nev. Rev. Stat. § 41.100(3) (In Nevada, only a decedent's estate can pursue claims on behalf of the decedent, who suffered an alleged Fourth Amendment violation).

**1.     The law regarding excessive force and prone restraint.**

**a.     Relevant excessive force law.**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Police officers may use only such force during a detention or arrest as is objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1986). "[T]he question is whether the Officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This determination "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The calculus of reasonableness must embody allowance for the fact that police officers are often

MAC:14687-307 5074153_2.docx

forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Determining whether a police officer's use of force was reasonable or excessive requires balancing the "nature and quality of the intrusion" on a person's individual liberty with the "countervailing governmental interests at stake." *Id*. at 396. This includes balancing such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the Officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

The issue is not whether other or lessor amounts of force could have been used, but only whether the force used was reasonable under the circumstances. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). "It is also well-established that police officers 'are not required to use the least intrusive degree of force possible.'" *Williamson v. City of National City,* 23 F.4th 1146, 1151 (9th Cir. 2022).

### b. § 1983 and compression asphyxia cases.

"Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *A.B. v. Cty. of San Diego*, 2020 WL 5847551, *17 (S.D. Cal. Oct. 1, 2020), *aff'd* 2022 WL 1055558 (9th Cir. 2022) (citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir.

Page 25 of 63

1997) *accord Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1007-98 (9th Cir. 2006)). The seminal Ninth Circuit case regarding positional asphyxia is *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003).

In *Drummond*, the court reversed a grant of summary judgment to defendant police officers in a positional asphyxia case. 343 F.3d at 1063. Drummond, a schizophrenic, was "hallucinating and in an agitated state" in a convenience store parking lot; the Officers were called to take Drummond into custody to "help protect" him. *Id.* at 1054. Even though Drummond had not committed a crime, was not a danger to himself or others, and did not offer resistance, the Officers knocked him to the ground and placed a knee to the back of his neck as they placed him into protective custody. *Id.* Post-handcuffing, two officers placed *their entire body weight* on Drummond's back and neck *for twenty-minutes* while he pleaded for air. *Id.* at 1054-55. Drummond suffered a heart attack and fell into a permanent coma. *Id.* The *Drummond* court was not critical of the Officers' actions pre-handcuffing (i.e., taking him into custody, "knock[ing] him to the ground", and using body weight; noting that "some degree of physical restraint may have been necessary to prevent [injuries]"). *Id.* at 1059. The court only took issue with the force applied "after he was handcuffed and lying on the ground" because:

> Once on the ground, prone and handcuffed, Drummond did not resist
> the arresting officers. Nevertheless, two officers, at least one of whom

MAC:14687-307 5074153_2.docx

was substantially larger than he was, pressed their weight against his torso and neck, crushing him against the ground.

*Id.* at 1059.

Post-*Drummond*, this Court and district courts have clarified its holding. Three years after *Drummond*, this Court issued its decision in *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090 (9th Cir. 2006). In that case, a decedent resisted four officers' attempts to handcuff him. After handcuffing, the Officers kept Tatum on his stomach for approximately ninety seconds. Consistent with *Drummond*, the court found the Officers' actions reasonable, focusing on the body weight used and not the prone positioning:

> It was objectively reasonable for the Officers to position [the decedent] on his stomach for approximately ninety seconds [post-handcuffing]. Officer Smith testified that [the decedent] kicked and struggled throughout the Officers' efforts to secure him in handcuffs. The Officers needed to incapacitate [the decedent], both to protect themselves and to protect him. As the district court noted, the summary judgment record did not contain evidence that any officer applied crushing pressure to [the decedent's] back or neck as he lay prone.

*Id.* at 1098. *Tatum* implied that *Drummond* only applied to an officer's use of bodyweight to an individual *post-handcuffing*. Almost every case interpreting *Drummond* agrees with this interpretation that it is only excessive to continue to apply body pressure for a prolonged period to a prone, handcuffed individual who is no longer a threat. *See Slater v. Deasey*, 776 Fed.Appx 942, 944-45 (9th Cir.

2019) ("*Drummond* provides fair warning" ... "that 'squeezing the breath from a *compliant, prone, and handcuffed individual* ... involves a degree of force that is greater than reasonable'.") (Emphasis added); *Greer v. City of Hayward*, 229 F.Supp.3d 1091, 1106-07 (N.D. Cal. 2017) (same), *Garlick v. Cty. of Kern*, 167 F.Supp.3d 1117, 1158 (E.D. Cal. 2016) (same), *Madrid v. City of Fresno*, 2011 WL 13243581, *12 (E.D. Cal. Feb. 23, 2011) (same).

A panel of this Court, in an unpublished memorandum, recently clarified that *"Drummond* does not stand for the proposition that, once a suspect stops moving, officers cannot continue holding the suspect in place." *A.B. v. Cty. of San Diego*, 2022 WL 1055558 (9th Cir. April 8, 2022). In *A.B.*, the Ninth Circuit affirmed a district court's granting of summary judgment to officers who used body weight to control a restrained and prone suspect for seven minutes, even though during the last thirty seconds the plaintiff "stopped moving and resisting." *2. The district court in *A.B.* stressed that, in *Drummond*, the suspect never resisted the officers, whereas the *A.B.* plaintiff "demonstrate[d]. . .active resistance to restraint and detention." *A.B. v. Cty. of San Diego*. 2020 WL 5843551, *18 (S.D. Cal. Oct. 1, 2020).

MAC:14687-307 5074153_2.docx

2. **The Officers used objectively reasonable force and did not violate the Constitution.**

a. **Nature and quality of the intrusion.**

Under *Graham*, the first issue is to evaluate the nature and quality of the Officers' force. The district court characterized the Officers' pre-handcuffing force as "a severe and substantial intrusion on Scott and his rights." (1-ER-009-10) It is undisputed that the Officers' placed partial body weight on Scott to control him for the 90 seconds they struggled to handcuff him. More importantly, it is undisputed the Officers removed all body weight and ceased all force seconds after handcuffing. This is not "severe" force.

It is assumed that the district court found the Officers' force used to handcuff Scott to be "severe" because that is how the *Drummond* court characterized the officers' force in that case. However, *Drummond* was only evaluating the officers' post-handcuffing force. In fact, *Drummond* found the officers' knocking of Drummond to the ground and use of bodyweight to restrain him for handcuffing purposes to be reasonable. 343 F.3d at 1059 ("some force was surely justified in restraining Drummond so that he could not injure either himself or the arresting officers. However, after he was handcuffed …."). Thus, the only force labeled "severe" by the *Drummond* court was the officers' placing of their

MAC:14687-307 5074153_2.docx

full body weight on Drummond for twenty minutes while he was prone, handcuffed, and pleading for air. *Id.* at 1056-57.

Because this case involves pre-handcuffing force, the more analogous cases are *Luchtel v. Hagemann*, 623 F.3d 975 (9th Cir. 2010) and *Jackson v. City of Bremerton*, 268 F.3d 646, 650-52 (9th Cir. 2001). In *Luchtel*, two police officers contacted a woman who was high on crack cocaine, suicidal, and delusional. Although the woman was unarmed and suspected of a minor crime, the officers took her to the ground when she resisted their handcuffing attempts. In the process, the woman suffered a dislocated shoulder and torn shoulder ligaments. 623 F.3d at 978. The officers then pinned her "to the floor for at least ten minutes while handcuffed with a broken arm and dislocated shoulder." *Id.* at 978, 981. The Ninth Circuit found that the officers used "*least amount of force necessary* . . . by pining [plaintiff who was resisting handcuffing] to the ground and handcuffing her" because there was "no allegation that the officers punched or kicked [her] or applied knee strikes", and there was no evidence that the officers "wrenched her arms up or gratuitously intensified pain in the handcuffing process." *Id.* at 982 (emphasis added). In *Jackson*, the court held that pushing a woman to the ground, placing a knee on her back to handcuff her, then "roughly" lifting her to her feet and putting her in a police car was considered a "normal handcuffing procedure" and deemed it a "minimal" amount of force. 268 F.3d at 650-52. *See also Sandoval*

*v. Officer Melvin of Winston Police Dep't*, 2021 WL 920858, \*6 (D. Or. 2021), aff'd sub nom. *Sandoval v. Melvin*, 2022 WL 883744 (9th Cir. 2022) (concluding the severity of the intrusion was "minimal" where the officer "grabbed [the plaintiff] while she stood atop two steps at the doorway entrance, took her 'down to the ground hard and fast,' and put a knee in her back" but did not use "additional force, such as kicks or punches"); *Beech v. City of Stockton*, 2021 WL 4429455, \*6 (E.D. Cal. 2021) ("tackling is typically considered a low quantum of force."). Thus, because the subject Officers stopped using force after handcuffing, this Court is only evaluating the Officers' pre-handcuffing force that is properly labeled "minimal force."

### b.    The government's need for force.

Having established the Officers' force in this case was minimal, the next issue is whether there was a governmental need to use such force by examining the *Graham* factors: (1) the severity of the crime, (2) whether Scott was an immediate threat, and (3) whether he was actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396.

**Severity of the crime.** The Officers acknowledge they were attempting to take Scott into custody for a mental evaluation and not a crime. Still, the fact that Scott had possessed two deadly weapons and was resisting the Officers' attempts

MAC:14687-307 5074153_2.docx

to pat him down, increased the seriousness of the detention and allowed for some force.

**Resisting arrest.** Scott was clearly resisting the Officers' attempts to pat him down and handcuff him. However, it is admitted he was not resisting in a manner that significantly threatened the Officers' safety, as his most aggressive act was the kicking of his feet. This resistance justified the restraining of Scott's limbs with empty-hand techniques.

**Immediate threat.** The most important *Graham* factor is whether Scott presented an immediate threat. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031-32 (9th Cir. 2018). The Officers acknowledge that Scott did not present a serious immediate threat – hence, they did not resort to using their guns, tasers, pepper spray, or batons. Further, they did not punch, kick, or otherwise strike Scott. Still, Scott did present a threat as he had exited his house with two deadly weapons and refused to be patted down for other weapons. *See United States v. Brown*, 996 F.3d 998, 1007-08 (9th Cir. 2021) (An officer is justified in conducting pat-down search of an individual if officer reasonably believes that his safety or that of others is in danger). Because the Officers were legitimately concerned that Scott might have additional weapons, they attempted to resolve the situation with the lowest level of force available – i.e., officer presence, verbal commands, and a standing pat down. This is exactly what the law requires. *See Gregory v. Cty. of*

MAC:14687-307 5074153_2.docx

*Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (officers acted reasonably by first issuing verbal commands and not "immediately engag[ing] in physical confrontation"). Scott resisted these efforts and escalated the situation by reaching towards his jacket. *Id.* at 1106-07 (reasonable to perceive a threat when a suspect refuses officer commands and acts in an aggressive manner). The Officers responded with a measured response by only attempting to control his arms. This decision also complies with the law. *See Drummond*, 343 F.3d at 1059 ("some force surely justified in restraining" mentally ill individual not suspected of a crime); *Gregory*, 523 F.3d at 1108 (reasonable to handcuff a mentally ill suspect who is not complying with verbal commands). Still, rather than just "knock [Scott] to the ground," *Drummond*, 343 F.3d at 1054, the Officers attempted to keep Scott upright and handcuff him from a standing position.

Scott eventually went to the ground. The district court found an issue of fact as to "whether Scott voluntarily dropped to the ground or fell or was taken down to the ground in a takedown maneuver." (1-ER-0005) This is not a material factual dispute because the law allows an officer to perform a takedown in such a situation. *See Drummond,* 343 F.3d at 1054, 1059 (no criticism of officer's decision "knock" a non-resisting emotionally distraught individual who was not suspected of a crime to the ground as the only criticism involved force applied "*after he was handcuffed* and lying on the ground . . ." (emphasis added)).

MAC:14687-307 5074153_2.docx

Plaintiff's own expert agrees the takedown was reasonable as he only complains more people were not present to participate. (3-ER-410)

Once on the ground, the Officers, pursuant to their training, secured different limbs and/or areas of Scott's body to facilitate handcuffing. Due to Scott's continued resistance, the Officers briefly applied weight to Scott's shoulder/upper back area and buttocks to control him. This is proper police procedure. (6-ER-1159-60) Thus, this action was also reasonable. *See Drummond,* 343 F.3d at 1059; *Gregory*, 523 F.3d at 1108-09 (reasonable to take mentally ill individual suspected of minor crime to the ground for handcuffing purposes where individual resisted and did not comply with verbal commands); *see also Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1183 & 1198 (9th Cir. 2002) (reasonable to hold down inmate and "climb[] onto back and legs, while the other deputies helped restrain his arms and legs" for three minutes to facilitate handcuffing). The fact that the Officers never used any police tools, threw any punches, or kicked Scott confirms that the Officers were carefully monitoring the situation and only using necessary minimal force. *Forrester*, 25 F.3d at 807.

There can be no dispute that the Officers' actions during the 90-second struggle to handcuff Scott were not only reasonable, but minimal as well. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (issue is whether officers act reasonably, not whether they used minimal force). The Officers acted in a manner

consistent with standard police training. (6-ER-1153-63) Most important, the Officers removed all body weight and placed Scott in the recovery position immediately after handcuffing. *See Moore v. City of Berkeley*, 801 Fed.Appx. 480, 483 (9th Cir. 2020) (no excessive force where officers did not apply pressure to areas that would have restricted breathing and moved suspect into recovery position as soon as safe to do so). Thus, the Officers' measured response to the threat Scott presented was reasonable under the circumstances.

### c.   The district court's "disputed facts" are not material.

As discussed *supra* in §II(B)*,* the Officers must satisfy this Court that qualified immunity is appropriate while viewing all disputed facts in Plaintiff's favor. Here, the district court identified the following disputed facts: (1) how Scott went to the ground (1-ER-010); (2) "the length of time and amount of pressure that was exerted on Scott's neck" (*id.*); (3) "there is dueling expert testimony regarding the impact on Huntsman's use of force on Scott's back and neck" (*id.*); (4) the threat Scott presented to the Officers (1-ER-011-12); and (5) whether Scott had the lawful right to resist (1-ER-011-12). None of these disputes are material.

#### *The manner in which Scott went to the ground*

According to the district court, an issue of fact exists as to whether "Scott voluntarily dropped to the ground or fell or was taken down to the ground in a takedown maneuver." (1-ER-006) (Plaintiff's Complaint asserts Scott "fell to the

Page 35 of 63

MAC:14687-307 5074153_2.docx

ground" and never alleges a "takedown" occurred. (6-ER-1226, 1232)) This dispute is not material because the Officers could lawfully perform a takedown under these circumstances. *See Drummond,* 343 F.3d at 1054, 1059 (no criticism of officer's decision "knock" a non-resisting emotionally distraught individual who was not suspected of a crime to the ground as the only criticism involved force applied "*after he was handcuffed* and lying on the ground …" (emphasis added)); *Gregory,* 523 F.3d at 1108-09 (reasonable to take mentally ill individual suspected of minor crime to the ground for handcuffing purposes where individual resisted and did not comply with verbal commands); *Luchtel*, 623 F.3d at 978. Plaintiff's own expert agrees as he only complained the Officers did not "formulate a plan that involved at <u>Team Take Down</u> …." Thus, Plaintiff's expert agrees a takedown was necessary, he just wishes more officers had been present to participate. 3-ER-410. In short, even if the Officers intentionally took Scott to the ground, the act does not offend the Fourth Amendment under these circumstances. Plus, the video confirms the alleged takedown was not controlled and not a violent takedown that could cause injury.

### *Body weight to the neck and back*

The district court found disputed facts regarding the length of time and amount of pressure exerted to Scott's neck and back. This is also not a material fact due to one very important fact – the Officers removed their body weight and

MAC:14687-307 5074153_2.docx

stopped all force seconds after Scott was handcuffed. The district court's Order makes no attempt to differentiate between the use of body weight pre-handcuffing and post-handcuffing. No Ninth Circuit case exists prohibiting the use of body weight pre-handcuffing. In *Cortesluna v. Leon*, a panel of this circuit addressed an officer's pressing of his knee into a suspect's back pre- handcuffing. 979 F.3d 645 (9th Cir. 2020). In that case, a domestic violence suspect, armed with a knife, was shot by two beanbag rounds. *Id.* at 650. As the suspect was surrendering and lowering himself to the ground, an officer "used his foot to push plaintiff to the ground" and "then pressed his knee in to plaintiff's back and pulled plaintiff's arms behind his back" for handcuffing. *Id.* The panel concluded that the officer's use of body weight, pre-handcuffing, was both excessive and violated clearly established law. *Id.* at 653-54. The Supreme Court reversed and held the officer was protected by qualified immunity because the appellate court failed to cite to a factually analogous case. *See Rivas-Villegas v. Cortesluna*, ___U.S.___, 142 S.Ct. 4, 8-9 (2022). *See also, e.g.*, *A.B.*, 2022 WL 1055558 (*"Drummond* does not stand for the proposition that, once a suspect stops moving, officers cannot continue holding the suspect in place.").

As discussed above, *Drummond* found it reasonable to "knock[]" Drummond to the ground and to initially use body weight to restrain him. *Id.* at

MAC:14687-307 5074153_2.docx

1057, 1059. The court was only critical of the force applied to Drummond "*after he was handcuffed* and lying on the ground" because:

> Once on the ground, *prone and handcuffed*, Drummond did not resist the arresting officers. Nevertheless, two officers, at least one of whom was substantially larger than he was, pressed their weight against his torso and neck, crushing him against the ground [for twenty minutes].

*Id.* at 1054-55 (emphasis added). Thus, because it is undisputed that both Officers removed all body weight within seconds of handcuffing, the duration and amount of the pressure used pre-handcuffing is immaterial to the excessive force analysis.

### *The dueling expert testimony regarding cause of death*

The Officers do not dispute an issue of fact exists regarding the cause of the death. Due to this dispute, the Officers do not argue causation. The issue of causation is not material to the issue of whether the Officers used reasonable force.

### *The threat Scott posed to the Officers*

As discussed above, the Officers have conceded that Scott did not present a serious threat of death or bodily injury. Therefore, the Officers only used the minimal force necessary to place Scott in handcuffs.

### *The lawful right to resist*

Finally, the district court found that because the Officers lacked probable cause to detain, Scott had the lawful right to arrest the Officers. First, as set forth above, the Officers had probable cause to detain Scott on a mental health hold.

MAC:14687-307 5074153_2.docx

This fact moots this fabricated factual dispute. In addition, this Court has held that the absence of probable cause *does not* grant an individual the right to offer resistance. *See Luchtel*, 623 F.3d at 981 (citing *United States v. Willfong*, 274 F.3d 1297, 1301 (9th Cir. 2001) ("[A] person does not have the right to resist arrest even if the charges are false or the arrest unlawful.")). An individual's limited right to offer reasonable resistance is only triggered by an officer's bad faith or provocative conduct. *Id.*; *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001). Here, there is no evidence of bad faith or provocative conduct.

### 3.   There is no clearly established law prohibiting the Officers' actions in this case.

Assuming, *arguendo*, this Court does not grant qualified immunity under the first prong of the qualified immunity analysis, it must then address qualified immunity's second prong: whether the law prohibiting the officer's conduct was clearly established. *See Rivas-Villegas*, 142 S.Ct. at 7 (citing *White v. Pauly*, 580 U.S. 73, 77-78 (2017)). "It is not enough," the Supreme Court has cautioned, "that a rule be suggested by then-existing precedent." *City of Tahlequah v. Bond*, ___U.S.___, 142 S.Ct. 9, 11 (2021). The right at issue must be defined with specificity because "specificity is especially important in the Fourth Amendment context, where … it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the

MAC:14687-307 5074153_2.docx

officer confronts." *Mullinex v. Luna*, 577 U.S. 7, 12 (2015). "It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted).

The following addresses the clearly established law regarding the Officers' (a) decision to detain, (b) decision to take Scott to the ground, and (c) force used to handcuff.

> **a.** **There is no clearly established law prohibiting the Officers from taking Scott into custody for a mental health hold.**

As discussed *infra*, the parties agree the Officers had the lawful right to take Scott into custody. Despite this agreement, the district court unilaterally concluded the Officers' lacked "probable cause to believe that Scott was likely to harm anyone, including himself, if left at his liberty." (1-ER-012) The district court did not cite to any cases supporting its conclusion.

Plaintiff must satisfy this Court that an officer violates clearly established law by attempting to obtain medical help for an individual (1) who calls 911 and falsely claims three assailants are attempting to harm him; (2) exits his apartment with two potential deadly weapons, (3) is clearly agitated and "experiencing a severe mental health crisis" (6-ER-1239-40); (4) tells the Officers he is paranoid schizophrenic, and (5) asks to be put in a police car. Plaintiff uses these facts to

describe Scott as "distressed," "agitated," "experiencing hallucinations, reporting three imagined assailants," "experiencing a severe mental health crisis", and having "mental problems immediately apparent to the Officers." (2-ER-069-70)

There is no clearly established law prohibiting officers from performing a mental health hold in similar circumstances, in fact the law is just the opposite. *See LeFay v. LeFay*, 673 Fed.Appx. 722, 724 (9th Cir. 2016) (probable cause to perform mental health hold (under California law) on individual who "had trouble walking, []appeared malnourished and dehydrated, and [] was wearing dirty clothes."); *Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007) (finding probable cause to detain individual under California law where the individual was depressed, had threatened to kill herself, and feared that a terrorist was going to kill her).

Scott's 911 call requesting help put the Officers in a no-win situation. The Officers could either have detained Scott for evaluation and help and risked being sued for violating his Fourth Amendment rights, or they could have refused to detain Scott, taken the chance he might harm himself or his neighbors, and risked being sued for failing to protect. This is the type of predicament from which the doctrine of qualified immunity is intended to protect peace officers. *See Hall v. City of Fremont*, 520 Fed.Appx. 609, 614 (9th Cir. 2013) (citing *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) ("This accommodation for reasonable error exists

MAC:14687-307 5074153_2.docx

because officials should not err always on the side of caution because they fear being sued." (Internal quote omitted)). Thus, at a minimum, qualified immunity is appropriate on the district court's fabricated lack of probable cause determination.

> **b.  No clearly established law prohibited the Officers from taking Scott to the ground.**

At the dispositive motion stage, Plaintiff argued the Officers used excessive force in taking Scott to the ground. This was a new claim not raised during discovery as Plaintiff had always maintained that Scott "fell to the ground." (6-ER-1226, 1232) Further, Plaintiff's own expert had opined that taking Scott to the ground was reasonable under the facts and circumstances confronting the Officers. (3-ER-410 ("once additional [LVMPD] [o]fficers and a Supervisor, arrived at scene, they could formulate a plan that involved at <u>Team Take Down</u> . . ." (emphasis in original)).

Despite this apparent agreement, Plaintiff's opposition to the Officers' summary judgment motion argued the Officers violated the Fourth Amendment by intentionally taking Scott to the ground. (2-ER-081-82) Plaintiff claims that *Rice v. Morehouse*, 989 F.3d 1112 (9th Cir. 2021) and *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) provide the requisite clearly established law. (*Id.*)

Plaintiff's reliance on *Rice* and *Blankenhorn* is misguided. *Rice* involved a traffic stop where officers pulled Rice, who "was not resisting in any way", 989

MAC:14687-307 5074153_2.docx

F.3d at 1123, out of his car and "'forcibly' [threw him] to the ground, face-first onto the pavement." *Id.* at 1121. Rice also claimed the officers held his arms back to ensure he would hit the ground face first. *Id.* at 1117. Thus, Rice's takedown was markedly different than Scott's "takedown," as Rice never resisted, was absolutely no threat, and yet was violently thrown face first down to the ground. *Blankenhorn* involved a man allegedly trespassing at a mall. The takedown consisted of three officers "almost immediately" "gang-tackl[ing], punching him, and using hobble restraints" because the man refused to kneel down to be handcuffed. 485 F.3d at 467. This Court noted that "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes excessive force" but found the suspect never resisted before being tackled and that there was no strategic need for the punches. *Id.* at 477. So, this Court noted the violence of the actual takedown, the unnecessary strikes, and the fact the suspect never actively resisted as support for its excessive force finding. *Id.* at 478-79.

More applicable to Scott's situation are the cases of *Drummond*, *Luchtel*, and *Gregory*. In *Drummond,* the detainee, Drummond, had not committed a crime, was not a danger to himself or others, and did not offer resistance, yet the court found it reasonable for the Officers to "knock[]" him to the ground because "some degree of physical restraint may have been necessary to prevent [injuries]." 343 F.3d at 1059, 1063. In *Luchtel*, this Circuit sanctioned two police officers taking a

MAC:14687-307 5074153_2.docx

woman who was high on drugs, suicidal, delusional, and suspected of a minor crime to the ground. 623 F.3d at 977-78. Finally, *Gregory* found it reasonable to take a mentally ill man who was holding a pen and suspected of trespassing to the ground. *Gregory,* 523 F.3d at 1108-09.

> **c.    There is no clearly established law prohibiting the force used by the Officers from using their body weight on Scott to facilitate handcuffing.**

The primary issue in this case has always been the force used by the Officers once Scott was on the ground. According to Plaintiff's summary judgment opposition, the Officers' use of body weight to facilitate handcuffing "was unreasonable, per *Drummond*." (2-ER-088) In support, Plaintiff cited to *Drummond* and the non-binding cases of *Greer v. City of Hayward*, 229 F.Supp.3d 1091 (N.D. Cal. 2017), *Garlick v. Cty. of Kern*, 167 F.Supp.3d 1117, 1158 (E.D. Cal. 2016), *Madrid v. City of Fresno*, 2011 WL 13243581 (E.D. Cal. Feb. 23, 2011), and *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005). (2-ER-088-090).

The Officers agree that *Drummond* and its progeny control this issue. In *Drummond*, the officers attempted to take Drummond into custody "for his own safety." 343 F.3d at 1054. After "knock[ing]" Drummond to the ground and handcuffing him, the officers "pressed their weight against [Drummond's] torso

MAC:14687-307 5074153_2.docx

and neck, crushing him against the ground" and "maintained that pressure for a significant period of time, ignoring his pleas for air." *Id.* at 1059, 1063.

This Court has stated that *Drummond* only applies to the use of prolonged body weight *post-handcuffing*. *See e.g., Slater v. Deasey*, 776 Fed.Appx 942, 944-45 (9th Cir. 2019) ("*Drummond* provides fair warning" ... "that 'squeezing the breath from a compliant, prone, and *handcuffed individual* ... involves a degree of force that is greater than reasonable'." (Emphasis added)). Several district court cases support this interpretation:

> ___*Garcia v. Yuba Cty. Sheriff's Dep't.*___, **2023 WL 3124398 (E.D. Cal. Apr. 27, 2023)**. Officers applied "body-weight pressure to [decedent's] upper body for nearly three minutes after he was handcuffed. *Id.* at *8. Court found *Drummond* clearly established "that using body weight to restrain an agitated, prone and *handcuffed* person who poses no serious safety threat would violate the person's Fourth Amendment right . . ." *Id.* at *11.

> ___*Greer v. City of Hayward*___, **229 F.Supp.3d 1091 (N.D. Cal. 2017)**: Officers held Greer in prone position for approximately seven minutes while Greer "repeatedly beg[ged] the officers to 'Get off [him].'" *Id.* at *1103. The court denied the officer qualified immunity because *Drummond* clearly established "that the officers' use of prolonged pressure while Greer lay on the ground in a prone position was substantially likely to cause death or serious injury." *Id.* at *1107.

> ___*Zelaya v. Las Vegas Metro. Police Dep't*___, **682 Fed.Appx. 565 (9th Cir. 2017)**: Jailers restrained a disruptive and agitated inmate by taking him to the ground and handcuffing him. After completing handcuffing, an officer remained on the decedent for 90 seconds. A panel of this Circuit, relying on *Drummond*, found it was clearly established that continued use of body weight for "at least 90 seconds

MAC:14687-307 5074153_2.docx

after [suspect] *was handcuffed and had stopped resisting*" violated *Drummond's* clearly established law. *Id.* (Emphasis added.)

***Garlick v. Cty. of Kern*, 167 F.Supp.3d 1117 (E.D. Cal. 2016)**: Plaintiffs "estimate[d] that officers were pressing weight on [decedent's] back for approximately eight to ten minutes" after it took "a couple of minutes" to effectuate handcuffing. *Id.* at 1132 n.9, 1157-58. Court denied qualified immunity stating "*Drummond* is sufficiently similar to the specific context of this case that it clearly warned officers that when a suspect is handcuffed and prone on the ground, further restraint measures, if applied as alleged here, would be unconstitutional." *Id.* at 1158.

***Abston v. City of Merced*, 506 Fed.Appx. 650 (9th Cir. 2013)**: Officers kept weight on a suspect for one minute and seven seconds post-handcuffing. The panel held that "[a] reasonable fact-finder could conclude the defendants' use of body compression was unreasonable. . .when Abston was handcuffed and shackled, in a prone position, and surrounded by numerous officers." *Id.* at 652-53

***Tucker v. Las Vegas Metro. Police Dep't*, 470 Fed.Appx. 627, 629 (9th Cir. 2012)**: Officers restrained a resisting suspect on a bed and continued to hold him down and tase him after he was handcuffed. *Id.* at 627. The panel found the "force used by the officers before [decedent's] handcuffing was reasonable" but questioned the post-handcuffing actions. "Turning to the clearly established law inquiry, we conclude that existing law recognized a Fourth Amendment violation where two officers use their body pressure to restrain a delirious, prone, and *handcuffed* individual who poses no serious safety threat." *Id.* at 629 (citing *Drummond*, 343 F.3d at 1059-60).

***Madrid v. City of Fresno*, 2011 WL 13243581 (E.D. Cal. Feb. 23, 2011)**: Plaintiffs alleged that an officer "had downward pressure and body weight on Madrid until his legs were hobbled" and that three officers used their body weight to hold Madrid down while he was tased. *Id.* at *7. Relying on *Drummond*, the court found the officers were not entitled to qualified immunity.

MAC:14687-307 5074153_2.docx

Plaintiff, recognizing that her case falls outside of *Drummond* because the Officers removed all body weight after handcuffing, asked the district court to consider the Seventh Circuit's decision in *Abdullahi*. Because *Abdullahi* is an out-of-circuit case, it has no precedential value. *See Community House, Inc. v. Bieter*, 623 F.3d 945, 967 (9th Cir. 2010) ("To determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act."); *Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004) (same); *Carrillo v. Cty. of Los Angeles*, 798 F.3d 1210, 1221 (9th Cir. 2015). In addition, *Abdullahi*, like this circuit's cases, holds that body weight is only improper when the suspect is prone, no longer resisting, and under control. 423 F.3d at 768.

Based upon the above, the issue is whether it was clearly established that an officer violates the Fourth Amendment when he uses his body weight to assist with handcuffing a mentally ill individual who is actively resisting. Recently, both the Supreme Court and Ninth Circuit have confirmed that no clearly established law prohibits the use of body weight to assist with handcuffing. *See Rivas-Villegas*, 142 S.Ct. at 8-9 (Supreme Court reversed a panel's finding that an officer's use of body weight, pre-handcuffing, was both excessive and violated clearly established law because panel failed to cite a factually analogous case); *Tatum*, 441 F.3d at 1097-98; *A.B.*, 2022 WL 1055558; *Gordon v. City & Cty. of San Francisco*, 2021

Page 47 of 63

MAC:14687-307 5074153_2.docx

WL 5449074, *11-12 (N.D. Cal. Nov. 22, 2021) (placing a knee into the back of a resisting suspect to facilitate handcuffing reasonable "even if it caused a significant injury.")

In *Tatum v. City & Cty. of San Francisco*, this Court (post-*Drummond*) stated "it was objectively reasonable to position [the decedent] on his stomach for approximately ninety seconds under the circumstances of his arrest" and that "Tatum has not cited any authority to support her argument that simply laying a suspect on his stomach can constitute excessive force, and we have found none." 441 F.3d at 1097-98. In 2022, a panel of this Court, in an unpublished memorandum, held that *"Drummond* does not stand for the proposition that, once a suspect stops moving, officers cannot continue holding the suspect in place." *A.B. v. Cty. of San Diego*, 2022 WL 1055558 (9th Cir. April 8, 2022). In *A.B.*, the panel affirmed a district court's granting of summary judgment to officers who used body weight to control a restrained and prone suspect for seven minutes, despite the fact that during the last thirty seconds the plaintiff "stopped moving and resisting." *2. Finally, in *Gordon v. City & Cty. of San Francisco*, a suspect complained an officer "lodged his knee into [his] back and pulled on his arm 'after [he] was on the ground in a prone position on [his] stomach with both of [his] hands controlled by' the officers." 2021 WL 5449074, *11-12 (N.D. Cal. Nov. 22, 2021). The district court found both that the officer acted reasonably and was

MAC:14687-307 5074153_2.docx

protected by qualified immunity because plaintiff "has identified no precedent clearly indicating that [the officer's] conduct . . . violated the Fourth Amendment." *Id. See also M.A.R. v. City of Los Angeles*, 2022 WL 2167453, *12-13 (C.D. Cal. March 28, 2022) (not unreasonable to allow decedent to remain on his stomach for two minutes due to decedent's resistance and struggle to avoid handcuffing); *Stickney v. City of Phoenix*, 2023 WL 2976943, *27 (D.Az. Mar. 17, 2023) (no clearly established law prohibiting "applying significant body weight to [suspect's] back for one- and one-half minutes while [suspect] was prone, but continued to kick and resist");

Based upon the above, Plaintiff cannot provide this Court with the requisite "clearly established" law because there is no controlling precedent that "squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. ___, 138 S.Ct. 1148, 1153 (2018).

> **d.    The district court did not properly apply the clearly established prong to the excessive force claim.**
>
> **(1)    <u>The district court's finding that it was clearly established that the Officers could not use force because they lacked probable cause is "blatantly contradicted" by the record.</u>**

The district court's Order denying qualified immunity struggled to properly address the clearly established prong. According to the Court:

MAC:14687-307 5074153_2.docx

> Based on plaintiffs' assertions, Defendants Smith and Huntsman violated Scott's Fourth Amendment right by using excessive force, resulting in death, when they employed force against an individual going through a mental health crisis who posed no threat, was compliant and passive with the officers, but who was nonetheless subject to being grabbed and forced to the ground unexpectedly and against his will. At the time force was initiated against him, he had committed no crime and there was no legal basis to take him into custody under Nevada law for a Legal 2000 detention.

(1-ER-016) In short, the district court attempted to get around *Drummond* and its progeny by finding that because the Officers lacked probable cause to detain Scott, any force used by the Officers was unreasonable as a matter of law. In support, the district court held "force is only justified when there is a need for force" citing *Blankenhorn*, 485 F.3d at 481. Because the district court's holding on the probable cause issue is "blatantly contradicted" by the record, this holding also has no value. Further, even if probable cause did not exist, Scott did not have *carte blanche* to resist. *See Luchtel*, 623 F.3d at 981 ("[A] person does not have the right to resist arrest even if the charges are false or the arrest unlawful.")); *see also Arpin*, 261 F.3d at 921.

### (2) The district court improperly attempted to circumvent *Drummond*'s clear holding.

The district court next found that, even if probable cause existed, it was clearly established the Officers were prohibited from using "nontrivial force when [Scott] has not resisted, or has merely engaged in passive resistance to, an officer's

Page 50 of 63

MAC:14687-307 5074153_2.docx

commands" and "for an officer to use substantial force against an individual suspected of a minor crime and who posed no threat to officer safety." (1-ER-016) In support, the district court cited to *Bryan v. MacPherson*, 630 F.3d 805, 829-30 (9th Cir. 2009) and *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1168 (9th Cir. 2011). (*Id.*)

The district court's statement of the law is not controversial. However, neither *Bryan* nor *Young* is sufficiently factually analogous to the subject case to serve as clearly established law. *Bryan* involved the use of a taser in dart mode without warning on an emotionally disturbed plaintiff who was not facing the officer when he was shot and was not resisting. 630 F.3d at 826-31. The court noted that while "passive resistance" can support the use of force, "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* at 830. Thus, *Bryan* clearly established that an officer's use of taser in dart mode against a mentally ill, unarmed, and non-resisting suspect was excessive. *Id.* at 832. *Young* involved a plaintiff who had exited his truck and was sitting on a curb eating broccoli, but refusing to get back into his vehicle, when an officer pepper sprayed him and struck him multiple times with a baton. 655 F.3d at 1159-60. This Court found this use of force unreasonable because plaintiff presented no threat, was not resisting, and was suspected of a minor crime. *Id.* at 1161-67.

MAC:14687-307 5074153_2.docx

Both *Bryan* and *Young* evaluated an officer's application of intermediate force through use of a police tool (taser, pepper spray, and baton). Here, the Officers refrained from using any police tools and attempted to use low-level empty hand techniques to effectuate the seizure. Most importantly, neither *Bryan* or *Young* involved the use of body weight or claims of compression asphyxiation.

The parties have always agreed that *Drummond* is the factually closest case. As established above, courts interpreting *Drummond* generally agree that "*Drummond* provides fair warning" ... "that 'squeezing the breath from a *compliant, prone, and handcuffed individual* ... involves a degree of force that is greater than reasonable'." *See Slater*, 776 Fed.Appx at 944-45 (emphasis added). The district court, ignoring the wealth of case law interpreting *Drummond*, attempted to circumvent the case's clear holding and "disagree[d] with Defendants' narrow construction of the principle clearly established in *Drummond*." (1-ER-018) The district court claimed the subject case is distinguishable because "there are genuine issues of disputed fact as to the extent of the force and its duration." (*Id.* (case citation omitted)). The district court claimed the Officers were arguing for "the Court to import a specific factual timeframe" that an officer is allowed to use body weight to facilitate handcuffing. (*Id.*) The Officers never asked for a "specific factual timeframe," rather, they argued that it is reasonable to use body weight so long as the individual remains

uncuffed and resisting. *See, e.g., A.B.*; *Gordon; Greer*; and *Tucker*. Thus, the Officers did not ask the district court to "narrow[ly]" construe *Drummond*.

Finally, the district court's "disputed facts" do not prevent a proper qualified immunity analysis. The district court listed the following disputed facts: (1) lack of probable cause to detain and whether Scott's behavior justified the Officers going hands on; (2) how Scott was taken the ground; (3) how actively Scott resisted the officers; (4) how long Ofc. Huntsman's knee was placed on Scott's neck; (5) how long it took to handcuff Scott; and (6) whether less intrusive tactics were available to the Officers. (1-ER-018) The lack of materiality of most of these "disputed facts" is outlined *supra* in §VII(B)(2)(c). With respect to Ofc. Huntsman's brief placement of his knee on Scott's neck for a few seconds, it is not material as there is no evidence it caused any injuries. *See Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) ("We may infer from the minor nature of a plaintiff's injuries that the force applied was minimal") (citing *Jackson*, 268 F.3d at 652. As to whether the Officers had different alternatives available to them, this Court has stated that the reasonableness analysis does not turn on whether the Officers might have had less intrusive means available to them or whether they could have taken a different course of action. "Imposing such a requirement would ... entangle courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Page 53 of 63

In short, none of the district court's disputed facts are material because this Court allows for all the pre-handcuffing force utilized by the Officers in this case.

### C. THE DISTRICT COURT ERRED IN FAILING TO GRANT THE OFFICERS QUALIFIED IMMUNITY ON PLAINTIFF 'S FOURTEENTH AMENDMENT CLAIM.

#### 1. <u>Relevant Fourteenth Amendment law.</u>

The Ninth Circuit recognizes that certain family members have standing to pursue § 1983 claims on behalf of relatives killed by law enforcement. *Moreland*, 159 F.3d at 370 (mother and children of decedent allegedly killed by officer's excessive force lacked standing to assert a survival action under § 1983 and Fourth Amendment but could pursue a Fourteenth Amendment due process claim); *see also Jones v. Las Vegas Metro Police Dep't*, 873 F.3d 1123, 1132-33 (9th Cir. 2017) (same).

Only "[o]fficial conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Id.* at 1132-33 (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). There are two different types of shocks the conscience cases. *See e.g., A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). Conscience shocking actions are those either taken with (1) "deliberate indifference" or (2) a "purpose to harm ... unrelated to legitimate law enforcement objectives." *Id.* The lower "deliberate indifference" standard applies to circumstances where "actual deliberation is practical." *Id.*

MAC:14687-307 5074153_2.docx

(citing *Wilkinson*, at 554). "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel v. Kent Sch. Dist.,* 648 F.3d 965, 974 (9th Cir. 2011) (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). It "entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013). The deliberate indifference "standard is sensibly employed only when action deliberation is "practical" –not merely when deliberation was theoretically possible. *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 851 (1998). For example, although deliberation during a high-speed vehicular chase is theoretically possible, it is not reasonably practicable, so the purpose to harm standard applies. In *Tan Lam v. City of Los Banos*, the officer had "time to consider what he was doing before" shooting, but the purpose to harm standard applied "because deliberation for purposes of shocks the conscience test is not so literal a concept." 976 F.3d 986, 1003 (9th Cir. 2020) (cleaned up).

The "purpose to harm" standard is more demanding and applies when an officer cannot practically deliberate, such as where "a law enforcement makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to a legitimate law

Page 55 of 63

enforcement objective." *Id.; see also Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008); *Jones*, 873 F.3d at 1133: *Flores-Zelaya,* 2016 WL 697782, *10-11 (D. Nev. Feb. 19, 2016). "The purpose to harm standard is a subjective standard of culpability." *S.R. v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) (citing *A.D.*, 712 F.3d at 453).

2. <u>The Officers did not violate Plaintiff's Fourteenth Amendment rights because Plaintiff lacks standing to pursue the claim, and, in the alternative, the Officers' actions were not conscience shocking.</u>

a. <strong>Plaintiff lacks standing to pursue a Fourteenth Amendment claim.</strong>

Plaintiff is Scott's adult daughter. "A decedent's parents and children generally have the right to assert a substantive due process claim under the Fourteenth Amendment." *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018). "Because parents have a constitutional protected interest in the companionship of their children, official conduct that 'shocks the conscience' in depriving parents of that interest" violates the Fourteenth Amendment. *Jones*, 873 F.3d at 1132-33 (quoting *Johnson v. BART*, 724 F.3d 1159, 1169 (9th Cir. 2013)).

However, this standing is not clearly established law, as only the Ninth and Tenth Circuits recognize that adult children have standing to pursue a Fourteenth Amendment due process claim on behalf of a deceased parent. *See Sinclair v. City of Seattle*, 61 F.4th 674, 679 (9th Cir. 2023). The Ninth Circuit *en banc*, will

Page 56 of 63

certainly follow the position of most sister circuits that have disallowed familial relation claims for adult children. *See e.g., BART*, 724 F.3d at 1170 n.3 (identifying out-of-circuit cases conflicting with the Ninth Circuit's position). And, regardless of how the *en banc* court might rule, the Supreme Court would likely reverse the positions of the Ninth and Tenth Circuits if it were to consider the issue— especially when, as here, there is no indication the officer even knew about and acted to disrupt the parent-child relationship.

### b.      The Officers' actions were not conscience shocking.

There is no genuine dispute that Scott's restraint resulted from the Officers' snap judgment about the best way to handle an escalating situation. In similar cases this Circuit has applied to purpose to harm standard. *See A.B.*, 2022 WL 1055558 at *2 (purpose to harm standard applied because situation "escalated quickly" and suspect "actively" resisted detention). Thus, the salient inquiry is whether there is any evidence that the Officers acted with a purpose to harm Scott that was unrelated to legitimate law enforcement objectives. There is no evidence that the Officers were attempting to "bully" or "get even" with Scott, *Wilkinson*, 610 F.3d at 554, and all the evidence supports the conclusion that the Officers only wanted to secure medical attention for the mentally ill Scott. Even if this Court concludes the deliberate indifference standard applies, there is no evidence that the Officers' actions "shock the conscience." Throughout the encounter, the Officers monitored

Page 57 of 63

MAC:14687-307 5074153_2.docx

their force, attempted to reassure Scott, and took precautionary steps to stop Scott from harming himself during the struggle.

At a minimum, there is no clearly established law putting the Officers on notice that their actions could violate the Fourteenth Amendment. *See A.B.; Flores-Zelaya*, 2016 WL 697782, *10-11 (no evidence of a Fourteenth Amendment violation when corrections officers took a disruptive inmate to the ground and used body weight to restrain him). Also, as discussed at length above, Officers are taught that "compression asphyxia" occurs when officers continue to apply body weight to prone *and handcuffed* individuals in an agitated state. *See Drummond*, 343 F.3d at 1056. Here, it is undisputed the Officers removed all body weight and placed Scott in the recovery position immediately after handcuffing – just as the law instructs. *See Moore v. City of Berkley*, 801 F3d.Appx. 480, 483 (9th Cir. 2020) (officers acted reasonably by moving suspect off her stomach and to the "recovery position as soon as she stopped struggling").

### D. IF THIS COURT FINDS THAT THE OFFICERS' ACTED REASONABLY FOR FOURTH AND FOURTEENTH AMENDMENT PURPOSES, THEN PLAINTIFF'S *MONELL* CLAIMS FAIL AS WELL.

This Court only has jurisdiction to address the district court's denial of qualified immunity in this interlocutory appeal. However, if this Court concludes that the Officers acted reasonably and did not violate the Constitution, then this

MAC:14687-307 5074153_2.docx

Court should dismiss Plaintiff's *Monell* claims against LVMPD as well. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact the departmental regulations might have authorized the [constitutional violation] is quite beside the point.").

## VIII. CONCLUSION

Based upon the above, the Officers respectfully request this Court reverse the district court and grant the Officers qualified immunity on all federal law claims and, if this Court finds the Officers acted reasonably, reverse the district court on the *Monell* claims against LVMPD.

Dated this 7th day of August, 2023.

MARQUIS AURBACH

By /s/ Craig R. Anderson
 Craig R. Anderson, Esq.
 Nevada Bar No. 6882
 10001 Park Run Drive
 Las Vegas, Nevada 89145
 Attorneys for Defendants-Appellants
 Kyle Smith; Theodore Huntsman, and
 Las Vegas Metropolitan Police
 Department

## <u>STATEMENT OF RELATED CASES</u>

Defendants-Appellants Kyle Smith; Theodore Huntsman, and Las Vegas Metropolitan Police Department are not aware of any related cases before this Court, and it is believed that there are no related cases under Ninth Circuit Rule 28-2.6.

Dated this 7th day of August, 2023.

MARQUIS AURBACH

By /s/ Craig R. Anderson
  Craig R. Anderson, Esq.
  Nevada Bar No. 6882
  10001 Park Run Drive
  Las Vegas, Nevada 89145
  Attorneys for Defendants-Appellants
  Kyle Smith; Theodore Huntsman, and
  Las Vegas Metropolitan Police
  Department

MAC:14687-307 5074153_2.docx

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that *(check appropriate option(s))*:

1.  ☒ *This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:*

    ☒ this brief contains <u>13,923</u> words (principal briefs must not exceed 14,000 words; reply briefs must not exceed 7,000 words) excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    ☐ this brief uses a monospaced typeface (10.5 or fewer characters per inch) and contains _____ lines of text (principal briefs must not exceed 1,300 lines of text; reply briefs must not exceed 650 lines of text), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  *This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:*

    ☒ this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14-point font, or

    ☐ this brief has been prepared in a monospaced spaced typeface using Microsoft Word, _____ font with _____ characters per inch.

3.  *This brief complies with the enlargement of brief size permitted by:*

    ☐ Ninth Circuit Rule 28-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). This brief is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

    ☐ court order dated _____. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). This brief is _____ words, _____lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

MAC:14687-307 5074153_2.docx

☐ the accompanying motion for leave to file an oversize brief pursuant to Circuit Rule 32-2 and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ the accompanying motion for leave to file an oversize brief pursuant to Circuit Rule 29-2(c)(2) or (3) and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

4.    *Capital Cases:*

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated this 7th day of August, 2023.


MARQUIS AURBACH


By /s/ Craig R. Anderson
      Craig R. Anderson, Esq.
      Nevada Bar No. 6882
      10001 Park Run Drive
      Las Vegas, Nevada 89145
      Attorneys for Defendants-Appellants
      Kyle Smith; Theodore Huntsman, and
      Las Vegas Metropolitan Police
      Department

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **DEFENDANTS-APPELLANTS' OPENING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 7th day of August, 2023.

☒ I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

☐ I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:


 /s/ Leah Dell_____
An employee of Marquis Aurbach

MAC:14687-307 5074153_2.docx